IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JEFFREY S. CLEGG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:16-CV-782-SRW |
| ) | [WO] |
| DR. TAHIR SIDDIQ, ) | |
| ) | |
| Defendant. ) | |

\* \* \* \* \* \*

| | |
|---|---|
| JEFFREY SCOTT CLEGG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:16-CV-930-SRW |
| ) | [WO] |
| JESSICA DUFFELL, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

This 42 U.S.C. § 1983 action for damages and injunctive relief involves a dispute over the adequacy of medical care and treatment afforded Plaintiff Jeffrey Clegg during his incarceration at the Bullock Correctional Facility ("Bullock") in Union Springs, Alabama.[1] Clegg names as defendants Dr. Tahir Siddiq and Health Services Administrator Jessica Duffell.[2]

Defendants filed an answer, special report, and supporting evidentiary materials addressing Clegg's claims for relief. In these documents, Defendants deny that they acted in violation of

---

[1] Since filing suit, Clegg has been released from custody.

[2] The parties in this case have consented to the exercise of jurisdiction by the Magistrate Judge under 28 U.S.C. § 636(c) for all proceedings. Doc. 21.

Clegg's constitutional rights. Defendants also contend that the complaint is due to be dismissed because Clegg failed to exhaust an administrative remedy available to him through the prison system's medical care provider regarding the medical claims against Dr. Siddiq prior to filing the complaint. Doc. 25. Defendants base their exhaustion defense on Clegg's failure to submit any medical grievance appeals regarding the claims presented against Dr. Siddiq. Doc. 25-2. In addition, Defendants maintain that Clegg's medical records indicate that he received appropriate medical treatment during the time relevant to the matters alleged. *See* Docs. 25-1, 25-2, 25-3, 25-4.

Upon receipt of Defendants' special report, the court issued an order providing Clegg an opportunity to file a response. This order directed Clegg to address Defendants' arguments that "he [] failed to exhaust his available administrative remedies as required by 42 U.S.C. § 1997e(a) of the Prison Litigation Reform Act ("PLRA") [prior to filing this federal civil action] . . .," and that "the complaint fails to establish that they in any way acted violation of Plaintiff's constitutional rights." Doc. 27 at 1–2 (footnote omitted). The order advised Clegg that his response should be supported by affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. 27 at 2-3. The order further cautioned Clegg that unless "sufficient legal cause" is shown within ten days of entry of this order "why such action should not be undertaken, . . . the court may at any time [after expiration of the time for his filing a response to this order] and without further notice to the parties (1) treat the special reports and supplemental special report and any supporting evidentiary materials as a motion for summary judgment or motion to dismiss, whichever is appropriate and (2) after considering any response as allowed by this order, rule on the motion in accordance with law." Doc. 27 at 3-4.

Clegg took advantage of the opportunity to file a response to Defendants' special report. Docs. 36, 37. In response to Defendants' exhaustion defense, Clegg argues that Duffell refused to

process a grievance regarding Dr. Siddiq, so he filed a grievance with the Board of Medical Examiners to exhaust administrative remedies. Doc. 37 at 5. However, Duffell maintains that Clegg failed to exhaust the available prison grievance procedure regarding the medical issues raised in his complaint against Dr. Siddiq. Specifically, Duffell contends that Clegg filed a variety of medical grievances during his incarceration at Bullock but, prior to filing this action, he never submitted a medical grievance appeal regarding Dr. Siddiq. Defendants produced Clegg's inmate medical file, maintained at the institution, which reflects that Clegg had access to and used the medical grievance procedure on numerous occasions to submit grievances, grievance appeals, and medical requests, but failed to submit a grievance or grievance appeal regarding the subject matter of his claim against Dr. Siddiq prior to filing this action. Docs. 25-2, 25-3, 25-4. While Clegg maintains that he exhausted his claim against Dr. Siddiq by writing to the Board of Medical Examiners, because Duffell refused to process a grievance, the Board is not part of the grievance procedure provided by the institutional medical provider.[3] *See Bock*, 549 U.S. at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison [medical provider's] requirements, and not the PLRA, that define the boundaries of proper exhaustion."). Contrary to Clegg's conclusory and unsupported assertions, the documents and records before the court demonstrate that during all times relevant to the allegations made, Clegg had access to the institutional medical provider's grievance process to exhaust his claims.

"[A]n exhaustion defense . . . is not ordinarily the proper subject for a summary judgment [motion]; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a

---

[3] Clegg submitted grievances on September 9 and 16, 2016, regarding Dr. Siddiq's conduct in prescribing him neomycin. Doc. 25-4 at 17, 22. However, Clegg has dismissed his claim regarding these grievances. *See* Docs. 19, 24. Clegg submitted no grievances prior to filing his complaint regarding his remaining claim against Dr. Siddiq, which alleges that the physician failed to treat his eye infection for six months. Docs. 25-3, 25-4.

motion for summary judgment." *Bryant v. Rich*, 530 F.3d 1368, 1374-1375 (11th Cir. 2008) (internal quotations omitted); *Trias v. Florida Dept. of Corrections*, 587 F. App'x 531, 534 (11th Cir. 2014) (District court properly construed defendant's "motion for summary judgment as a motion to dismiss for failure to exhaust administrative remedies[.]"). Therefore, the court will treat Defendant Siddiq's special report as a motion to dismiss. The court will treat Defendant Duffell's special report as a motion for summary judgment.

## II. STANDARD OF REVIEW

**A.  Exhaustion**

In addressing the requirements of 42 U.S.C. § 1997e exhaustion, the Eleventh Circuit has

> recognized that [t]he plain language of th[is] statute makes exhaustion a precondition to filing an action in federal court. This means that until such administrative remedies as are available are exhausted, a prisoner is precluded from filing suit in federal court.

*Leal v. Ga. Dept. of Corrs.*, 254 F.3d 1276, 1279 (11th Cir. 2001) (citations and internal quotations omitted). Furthermore, "the question of exhaustion under the PLRA [is] a 'threshold matter' that [federal courts must] address before considering the merits of the case," and that cannot be waived. *Myles v. Miami-Dade Cnty. Corr. & Rehab. Dept.*, 476 F. App'x 364, 366 (11th Cir. 2012) (quoting *Chandler v. Crosby*, 379 F.3d 1278, 1286 (11th Cir. 2004)).

"When deciding whether a prisoner has exhausted his remedies, the court should first consider the plaintiff's and the defendants' versions of the facts, and if they conflict, take the plaintiff's version of the facts as true. 'If in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed.'" *Myles*, 476 F. App'x at 366 (quoting *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008)). "If the complaint is not subject to dismissal at this step, then the court should make specific findings in order to resolve the disputed factual issues related to exhaustion." *Id.* (quoting

*Turner,* 541 F.3d at 1082). Consequently, a district court "may resolve disputed factual issues where necessary to the disposition of a motion to dismiss for failure to exhaust [without a hearing]. The judge properly may consider facts outside of the pleadings to resolve a factual dispute as to exhaustion where doing so does not decide the merits, and the parties have a sufficient opportunity to develop the record." *Trias*, 587 F. App'x at 535. Based on the foregoing, the Eleventh Circuit has rejected an inmate-plaintiff's argument that "disputed facts as to exhaustion should be decided" only after a trial either before a jury or judge. *Id*. at 534.

**B.     Summary Judgment**

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomm., Inc*., 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing the non-moving party has failed to present evidence to support some element on which it bears the ultimate burden of proof. *Id*. at 322−324.

Defendant Duffell has met her evidentiary burden. Thus, the burden shifts to Clegg to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at

324; Fed. R. Civ. P. 56(e)(3); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–594 (11th Cir. 1995) (holding that, once the moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or sworn statements], or by depositions, answers to interrogatories, and admissions on file," demonstrate there is a genuine dispute of material fact) (internal quotations omitted). This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014). A genuine dispute of material fact exists when the non-moving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Public Educ.*, 495 F.3d 1306, 1313 (11th Cir. 2007).

Although factual inferences must be viewed in a light most favorable to the non-moving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard v. Banks*, 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Clegg's *pro se* status alone does not compel this court to disregard elementary principles of production and proof in a civil case.

### III. DISCUSSION

**A.     Dr. Siddiq**

Clegg challenges the adequacy of medical care that Dr. Siddiq provided him at the Bullock Correctional Facility from December 18, 2015, to July 15, 2016, regarding an eye infection.[4] Doc. 1 at 2–5. Defendant Siddiq denies Clegg's allegations and also contends that this case is subject to

---

[4] As noted, on January 17, 2017, Clegg filed a motion to dismiss his claim against Dr. Siddiq, which alleged that the physician prescribed Clegg neomycin for the purpose of not curing or healing an infection in his eyes. Doc. 17 at 1. The court granted Clegg's request to dismiss this claim against Dr. Siddiq. Doc. 24. Clegg's remaining claim against Dr. Siddiq alleges that after Clegg returned from a free world eye appointment in December 2015, at which he was diagnosed with dry eyes, the physician failed to treat him for the condition until July of 2016. Doc. 19 at 1–2.

dismissal because Clegg failed to exhaust the administrative remedy provided to him by the institutional medical care provider prior to filing suit as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). Docs. 25-2.

The PLRA compels exhaustion of available administrative remedies before a prisoner can seek relief in federal court on a § 1983 complaint. Specifically, 42 U.S.C. § 1997e(a) states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Congress has provided in § 1997e(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative remedies." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of all available administrative remedies is a precondition to litigation and a federal court cannot waive the exhaustion requirement. *Booth*, 532 U.S. at 741; *Alexander v. Hawk*, 159 F.3d 1321, 1325 (11th Cir. 1998); *Woodford v. Ngo*, 548 U.S. 81 (2006). Moreover, "the PLRA exhaustion requirement requires proper exhaustion," which

> demands compliance with an agency's deadlines and other critical procedural rules [as a precondition to filing suit in federal court] because no adjudicative system can function effectively without imposing some orderly structure on the courts of its proceedings. . . . Construing § 1997e(a) to require proper exhaustion . . . fits with the general scheme of the PLRA, whereas [a contrary] interpretation would turn that provision into a largely useless appendage.

*Woodford*, 548 U.S. at 90–93. The Supreme Court reasoned that because proper exhaustion of administrative remedies is necessary, an inmate cannot satisfy the PLRA's "exhaustion requirement . . . by filing an untimely or otherwise procedurally defective administrative grievance

7

or appeal[,]" or by effectively bypassing the administrative process simply by waiting until the grievance procedure is no longer available to him. *Id*. at 83–84; *Bryant*, 530 F.3d at 1378 (holding that prisoners must "properly take each step within the administrative process" to exhaust administrative remedies in accordance with the PLRA); *Johnson v. Meadows*, 418 F.3d 1152, 1157 (11th Cir. 2005) (holding that an inmate who files an untimely grievance or simply spurns the administrative process until it is no longer available fails to satisfy the exhaustion requirement of the PLRA); *Higginbottom v. Carter*, 223 F.3d 1259, 1261 (11th Cir. 2000) (holding that inmate's belief that administrative procedures are futile or needless does not excuse the exhaustion requirement). "The only facts pertinent to determining whether a prisoner has satisfied the PLRA's exhaustion requirement are those that existed when he filed his original complaint." *Smith v. Terry*, 491 F. App'x 81, 83 (11th Cir. 2012).

It is undisputed that the health care provider for the Alabama Department of Corrections provides a grievance procedure for inmate complaints related to the provision of medical treatment. Defendants' evidentiary materials reflect that Clegg had access to the grievance procedure at Bullock at all times while incarcerated at the facility and that no correctional staff interfered with his ability to file a grievance. When inmates are processed into the custody of the Alabama Department of Corrections, they are educated about the procedure and processes for obtaining medical care and prescribed medication, and also receive this information in a document entitled Access to Healthcare Services. The document includes information regarding the availability of the medical grievance process whereby inmates may voice complaints regarding any medical treatment sought or received during their incarceration. Inmate grievance forms are available to inmates at Bullock to submit a grievance related to the provision of health care. Inmate grievance forms and grievance appeal forms are available from the correctional shift commander office at Bullock and the health care unit. Inmates are instructed to place their completed grievance

or grievance appeal in the grievance box in the hallway outside of the medical unit. Duffel or her designee provide a written response to an inmate's grievance at the bottom of the form within approximately ten business days and return the completed form to the inmate. At the bottom of the inmate grievance is information about how an inmate may appeal the response he receives to his initial inmate grievance. A written response to a formal grievance appeal is provided in approximately ten business days of receipt. The inmate may also be summoned for a one-on-one meeting with medical staff, the Health Services Administrator, or the Director of Nursing regarding his grievance appeal. Doc. 25-2; Doc. 25-3 at 25–26, 29; Doc. 25-4.

The record establishes that Clegg had an administrative remedy available to him at Bullock during his confinement at the facility. Clegg does not challenge the availability of a grievance procedure at the prison. Defendants' evidence further establishes Clegg failed to exhaust the remedy regarding his claim against Dr. Siddiq prior to filing this civil action. Specifically, despite the availability of a grievance procedure, Clegg submitted no grievance or grievance appeal in accordance with the institutional medical provider's grievance procedure addressing the claim he presents for relief against Dr. Siddiq. Clegg's conclusory and unsupported allegations do not justify his failure to exhaust this administrative remedy during the time it was available to him. The pleadings filed by Clegg further establish that, since filing this cause of action, he has been released from custody. Clegg's access to the administrative remedy provided by Defendants is, thus, no longer available to him. Dismissal with prejudice is therefore appropriate regarding Clegg's claims against Dr. Siddiq. *Woodford*, 548 U.S. at 87–94. *See Marsh v. Jones*, 53 F.3d 707, 710 (5th Cir. 1995) ("Without the prospect of a dismissal with prejudice, a prisoner could evade the exhaustion requirement by filing no administrative grievance or by intentionally filing an untimely one, thereby foreclosing administrative remedies and gaining access to a federal forum without exhausting administrative remedies."); *Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2004)

(footnotes omitted) (holding an inmate's "federal lawsuits . . . properly dismissed with prejudice" where previously available administrative remedies had become unavailable).

**B.     Injunctive Relief**

Clegg requests injunctive relief for the alleged violations of his constitutional rights. As noted above, Clegg is no longer incarcerated. The transfer or release of a prisoner renders moot any claims for injunctive or declaratory relief. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *see also Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (finding past exposure to even illegal conduct does not in and of itself show a pending case or controversy regarding injunctive relief if unaccompanied by any continuing present injury or real and immediate threat of repeated injury). As it is clear from the pleadings and records before the court that Clegg is no longer incarcerated, his request for equitable relief is moot.

**C.     Defendant Duffell[5]**

**i. Deliberate Indifference Claim Against Duffell in Her Official Capacity**

To the extent that the alleged constitutional violations Clegg claims against Duffell are brought against her in her official capacity, she is entitled to absolute immunity from monetary damages. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S. Ct. 1114, 1125 (1996).

---

[5] On January 18, 2017, Clegg filed a motion to dismiss his claim against Duffell that she did not provide him with enough baby shampoo with which to wash and clean his eyes. Doc. 18 at 1. The court granted Clegg's request to dismiss this claim against Duffell. Doc. 24. Clegg's remaining claims against Duffell allege that she delayed providing him with a doctor-prescribed item (baby shampoo) for treatment of his eye infection and on one occasion purportedly gave him baby shampoo that burned his eyes. *See* Civil Action No. 2:16-cv-930-SRW (Doc. 1 at 2–5).

Alabama has not waived its Eleventh Amendment immunity, see *Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity. Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear that Duffell is a state actor entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from her in her official capacity. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994).

### ii. Deliberate Indifference Claim Against Duffell in Her Individual Capacity

Duffell argues that she is entitled to qualified immunity, which offers complete protection from civil damages for government officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Qualified immunity is not merely a defense against liability but rather immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (quotation marks and citations omitted) (alteration added). To receive qualified immunity, the public official must first prove that she was acting within the scope of her discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). The record shows that Duffell was acting within the course and scope of her discretionary authority when the incidents complained of occurred. Clegg must, therefore, allege facts that, when read in a light most favorable to him, show that Duffell is not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy his burden, Clegg must establish two things: (1) that a defendant committed a constitutional violation and (2) that the constitutional right a defendant violated was "clearly established." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quotation marks and citations omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). If Clegg cannot establish both elements to satisfy his burden, Duffell is entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010).

"The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999) (*citing Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To demonstrate a denial of medical care in violation of the Eighth Amendment, Clegg must prove both an objective and subjective component. The objective element requires Clegg to demonstrate the existence of an "objectively serious medical need." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir.2003). A serious medical need is " 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' " *Id*. (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." *Id*. (quotation marks and citation omitted). The

subjective component of Clegg's medical claim requires that he demonstrate "deliberate indifference" to a serious medical need. *Farrow*, 320 F.3d at 1243. Deliberate indifference is shown by establishing that a defendant had actual knowledge or awareness of an obvious risk to a plaintiff's serious medical need and failed to take steps to abate that risk. It may be demonstrated by either actual intent or reckless disregard. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference." *Id*. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding a defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). "[A]an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. "Deliberate indifference" also entails more than mere negligence. *Estelle*, 429 U.S. at 106; *Farmer*, 511 U.S. at 835.

> The Supreme Court clarified the "deliberate indifference" standard in *Farmer* by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970, 128 L.Ed.2d 811. In interpreting *Farmer* and *Estelle*, this Court explained in *McElligott* that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott*, 182 F.3d at 1255; *Taylor*, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

*Farrow*, 320 F.3d at 1245–46.

"Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." *Hill*, 40 F.3d at 1187 (quotation marks

13

and citations omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Id*.

> The seriousness of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. Where the delay results in an inmate's suffering a life-long handicap or permanent loss, the medical need is considered serious. An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. Further, we have held that [t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay. Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

*Hill*, 40 F.3d at 1188–89 (quotation marks and citations omitted) (footnotes omitted). Further "whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quotation marks and citation omitted); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) (holding that "[a] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that the mere fact an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution).

Clegg alleges that Duffell denied him treatment that an ophthalmologist prescribed to treat his keratitis.[6] He states that the treatment required him to wash his eyes with baby shampoo four times a day for six months to keep the keratitis broken down and cleansed from his eyes. However,

---

[6] Dr. Siddiq explains that "keratitis is inflammation of the cornea. The condition may result from a number of causes, including scratching to the surface of the cornea or infection. Signs, or symptoms, of keratitis may, but do not always, include redness, discomfort, excessive tearing, blurred vision, sensitivity to light and irritation. These symptoms may arise from conditions unrelated to keratitis." Doc. 25-1 at 3.

14

Clegg claims that Duffell failed to obtain enough baby shampoo from July 2016 to November 2016 so he could cleanse his eyes four times a day. Clegg complains that for three weeks in November 2016 he received no baby shampoo. Clegg further asserts that Duffell gave him a bottle of anti-bacterial soap instead of baby shampoo, which burned his eyes. He returned the bottle containing the offensive liquid to Duffell and told her he needed baby shampoo, but he says that Duffell gave him nothing. Clegg alleges that the lack of sufficient baby shampoo caused his eyes to ache and burn from the keratitis. *See* Civil Action No. 2:16-cv-903-SRW (Doc. 1 at 2–5).

Duffell is the Health Services Administrator at Bullock. She denies Clegg's allegations and maintains that they are false. Duffell states that her duties and responsibilities are primarily administrative and include oversight of the general administration of the mail delivery system and the medical staff at Bullock. Duffell testifies that she is not a medical provider or a member of the nursing staff. She is not authorized to diagnose medical conditions, prescribe medication, order diagnostic tests, request referrals for off-site medical care, or direct an inmate's course of medical care and treatment. Doc. 25-2 at 1–2.

Clegg's medical records reflect that an off-site ophthalmologist conducted an eye examination on July 12, 2016, and diagnosed him with dry eyes, nearsightedness, and "insignificant cataracts." Doc. 25-3 at 62. The ophthalmologist recommended to the Bullock medical staff that Clegg apply Maxitrol ointment in both eyes before bedtime, clean his eyelids twice a day with baby shampoo, and use artificial tears every two hours during the day. Doc. 25-3 at 62. The ophthalmologist further recommended that the Bullock medical staff only schedule a follow-up evaluation for Clegg if his symptoms did not resolve in three months. Doc. 25-3 at 62. On the same day on which Clegg had his visit to the off-site ophthalmologist, the ophthalmologist providing services at Bullock entered an order for Clegg to receive artificial tears for 180 days to use daily as needed through January 7, 2017, and to use baby shampoo daily for 180 days as a

scrub for his eyelids. Doc. 25-3 at 31; Doc. 25-4 at 65, 66. Clegg received both the baby shampoo and artificial tears on a keep-on-person (KOP) basis. Doc. 25-3 at 32; *see also* Doc. 25-2.

Duffell testifies that she met with Clegg on July 12, 2016, and provided him with a 15-ounce bottle of baby shampoo. Duffel states that she gave Clegg instructions on how to use the baby shampoo as a topical scrub for daily cleaning of his eyelids. Clegg complained that the shampoo was not a name brand, but acknowledged that he understood Duffell's instructions. Doc. 25-2; Doc. 25-4 at 52.

Duffell testifies that she met with Clegg on August 11, 2016, and gave him a second fifteen-ounce bottle of baby shampoo. She explained to Clegg that, if he were using his shampoo as directed by the off-site ophthalmologist, there should be shampoo left from the previous month's supply. Duffell testifies that she cautioned Clegg that overuse of the shampoo could injure his eyes and reminded him of the importance of following the ophthalmologist's instructions regarding proper use of the shampoo to avoid discomfort. Duffell states that Clegg acknowledged his understanding of her instructions, but became angry with her for discouraging him from overusing the shampoo. Doc. 25-2; Doc. 25-4 at 52.

Duffell testifies that on September 30, 2016, she provided Clegg with another 15-ounce bottle of baby shampoo. Duffell testifies that she reiterated to Clegg that overuse of the shampoo could be detrimental to his eyes, and that Clegg became "very argumentative" with her, which led to his removal from the healthcare unit by correctional staff. Doc. 25-2; Doc. 25-4 at 52.

Clegg submitted several sick call request forms in November 2016 complaining that medical staff failed to provide him with baby shampoo and antibacterial eye ointment for his dry eyes, and that the baby shampoo bottle he received was contaminated and did not contain baby shampoo. Duffell testifies that she met with Clegg on November 8, 2016, provided him with another bottle of baby shampoo, and informed him how to use the shampoo in compliance with

the off-site ophthalmologist's instructions. According to Duffell, after she assured Clegg that the baby shampoo was not contaminated, he took the shampoo and left the healthcare unit. Duffell testifies that Clegg's assertions that he received either contaminated shampoo, or bottles which did not actually contain baby shampoo, are completely groundless. Doc. 25-2; Doc. 25-4 at 48–52.

Duffell testifies that her last interaction with Clegg was on November 23, 2016, at which time she offered him another bottle of baby shampoo. Duffell testifies that Clegg claimed the bottle was contaminated, had been tampered with, and was not a name brand, and refused to take the shampoo and angrily left the healthcare unit. Doc. 25-2; Doc. 25-4 at 53.

Dr. Siddiq saw Clegg on November 29, 2016, at which time Clegg demanded that he be given a brand of baby shampoo different from that previously provided by the medical staff. Dr. Siddiq observed no signs of redness, irritation, or other symptoms of infection in Clegg's eyes and concluded that he no longer needed to use the baby shampoo, but directed him to continue using eye drops for any dryness he experienced. Dr. Siddiq discontinued the order for baby shampoo on December 21, 2016. Doc. 25-4 at 43, 44.

Clegg presents no evidence sufficient to create a genuine issue of disputed fact regarding the claim that Duffell acted with deliberate indifference to his medical needs. It is clear from the pleadings filed in this case that Duffell's primary duties are administrative, and she does not make decisions regarding inmate medical care and treatment. There is no evidence that Duffell attempted to intercede, overrule, or influence decisions made by medical personnel regarding Clegg's medical care. There is also nothing before the court which indicates that Duffell personally participated in or had any direct involvement with the medical treatment provided to Clegg. Rather, Duffell's interactions with Clegg involved responding to his medical grievances and dispensing prescribed products for the treatment of his eye condition, including baby shampoo and eye ointment, as well as reiterating the doctors' instructions for use. Doc. 25-2. *See Williams v.*

*Limestone Cty., Ala.*, 198 Fed. App'x. 893, 897 (11th Cir. 2006) ("supervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care"); *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.") (citation and internal quotations omitted).

Assuming that Clegg's eye condition constituted a serious medical need, he has not shown on this summary judgment record that Duffell acted with deliberate indifference to his medical needs. His contention that Duffell delayed providing him with baby shampoo and dispensed an injurious substance on one occasion is not supported by the medical records. Clegg's conclusory assertion that Duffell "wrote false notes in [his] medical file" regarding the dates on which she provided him with the baby shampoo is insufficient. Doc. 37 at 6. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir.1997) (per curiam) (holding plaintiff's "conclusory assertions . . ., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment"); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir.1995) (holding grant of summary judgment appropriate where inmate "produced nothing, beyond his own conclusory allegations" challenging actions of the defendants). Further, an inmate who complains that a delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. *Hill,* 40 F.3d at 1188. The evidence offered here fails to show there any detrimental effect to Clegg due to any alleged delay in his receipt of baby shampoo. Further, no evidence before the court reflects that the condition of Clegg's eyes changed, worsened, or declined because of any actions by Duffell, nor is there any evidence that the manner in which Duffell addressed his condition created a substantial risk to his health which she or any other attending health care personnel consciously disregarded. *McElligott*,

182 F.3d at 1255 (holding that for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate).

Duffell's affidavit regarding her interactions with Clegg are corroborated by the contemporaneous objective medical records. *See* Doc. 25-2, 25-3, 25-4. The law is settled that "[s]elf serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records," and they do not do so here. *Whitehead v. Burnside*, 403 Fed. App'x 401, 403 (11th Cir. 2010) (citing *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990)). The record is devoid of evidence that Duffell acted with deliberate indifference to a serious medical need experienced by Clegg. *Farmer*, 511 U.S. 825; *Quinones,* 145 F.3d at 168. Accordingly, Defendant Duffell is entitled to qualified immunity on Clegg's Eighth Amendment claim.

## VI. CONCLUSION

Accordingly, it is ORDERED and ADJUDGED that:

1. Defendant Siddiq's motion to dismiss (Doc. 25) is GRANTED to the extent that he seeks dismissal of this case due to Plaintiff's failure to exhaust an administrative remedy available to him at the Bullock Correctional Facility properly prior to initiating this cause of action;

2. This case against Defendant Siddiq is DISMISSED with prejudice under 42 U.S.C. § 1997e(a) for Plaintiff's failure to exhaust an administrative remedy before seeking relief from this court.

3. Defendant Duffell's motion for summary judgment (Doc. 25) is GRANTED.

A separate judgment will be entered.

Done, on this the 31st day of July, 2019.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge